IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| URBN US RETAIL LLC,     : | |
|       Plaintiff,     : | |
|       : | |
| v.     : | Civ. No. 21-4807 |
|       : | |
| ZURICH AM. INS. CO.,     : | |
|       Defendant.     : | |
|       : | |

Diamond, J.                                                                                   June 28, 2023

### MEMORANDUM

Plaintiff URBN US RETAIL LLC ("Urban Outfitters" or "the Company") seeks a declaration that its insurer, Defendant Zurich American Insurance Company, must cover the Company's COVID-19-related expenses and business losses. 42 Pa. C.S. §§ 7531-7541. The Zurich Policy "insures against direct physical loss of or damage" to the Company's property. (Doc. No. 1-1, Compl.; id., Ex. 1, Policy, § 1.01.) Zurich urges that the Third Circuit's recent holding in Wilson v. USI Insurance Service LLC forecloses Urban Outfitter's action as a matter of law. 57 F.4th 131 (3d Cir. 2023). In opposing dismissal, Urban Outfitters seeks to confound the English language and so read Wilson out of existence. Because under Wilson, the Company cannot show direct physical loss or change, I will dismiss on this ground. In the alternative, I conclude that the Policy's contamination exclusion also compels dismissal.

I.    BACKGROUND

    A.    Factual Allegations

The onset of COVID-19 in early 2020 is well known. To stop the virus's spread, innumerable local and state governments ordered the closure of nonessential businesses. These orders compelled Urban Outfitters to close its 200 stores, where it had documented some 1,400

1

COVID-19 cases. (Compl. ¶ 9.) Once its stores were permitted to reopen, the Company reconfigured their layouts, installed safety facilities (*e.g.*, sanitizing stations and temperature-check stations), and upgraded ventilation systems—all to mitigate spread of the virus. (Id. ¶ 28.) To recover COVID-related business losses and expenses, the Company sought coverage from Zurich under several Time Element and Special Coverage Policy provisions—nearly all requiring "direct physical loss of or damage" to insured property. (Id. ¶ 28.)

In denying coverage, Zurich determined, *inter alia*, that: the "presence of the COVID-19 virus does not constitute 'direct physical loss or damage' to property"; and the "presence of the COVID-19 virus is excluded as a cause of loss under the [Policy's] Contamination Exclusion." (Id. ¶¶ 35, 36.)

### B. Applicable Provisions

The Policy includes "Time Element" coverage, which applies to business income losses from the suspension of business activities "due to direct physical loss of or damage to property. . . caused by a Covered Cause of Loss at the Location." (See Policy § 4.) The Policy also includes both an "Extra Expense" provision, which covers additional costs incurred "due to direct physical loss of or damage. . . caused by a Covered Cause of Loss," and a further "Leasehold Interest" provision, which covers "loss incurred by the Insured (as lessee) resulting from direct physical loss of or damage caused by a Covered Cause of Loss to a building (or structure) which is leased and not owned by the Insured." (Id. §§ 4.02.03, 4.02.04.) A "Covered Cause of Loss" includes "all risks of direct physical loss of or damage from any cause unless excluded." (Id. §7.11.)

The Policy also includes "Special Coverages" for "Civil or Military Authority," "Ingress/Egress," and "Tenants Prohibited Access," all of which provide coverage for loss caused

by some restriction of access (whether by civil or military authority or physical obstruction) to an insured location.  (Id. §§ 5.02.03, 5.02.15, § 5.02.28.)  The first two additionally require "direct physical loss of or damage caused by a Covered Cause of Loss" to third-party property within five miles of the Insured's location.  (Id. §§ 5.02.03, 5.02.15.)

The Policy excludes from coverage damage caused by "Contamination, and any cost due to Contamination, including the inability to use or occupy the property or any cost of making property safe or suitable for use or occupancy."  (Id. § 3.03.01.03.)  "Contamination" is defined as "any condition of property due to the actual presence of any. . . virus, disease causing or illness causing agent."  (Id. § 7.11.)  Under the "Law and Ordinances" provision, the Policy further excludes from coverage any "[l]oss or damage arising from the enforcement of any law, ordinance, regulation, or rules regulating or restricting the. . . occupancy, operation or other use, or removal including debris removal of any property."  (Id. §3.03.02.01.)

### C.  Procedural History

The Company initiated this suit in Pennsylvania state court in October 2021, seeking declarations under Pennsylvania law (which Defendant agrees governs here) that: (1) the presence of COVID-19 at covered locations or at locations within five miles from them constitutes "direct physical loss of or damage" to property as described in the Policy; (2) the Company's losses are thus covered under various Policy provisions; and (3) no exclusion applies to the Company's claims.  (Compl. ¶¶ 43, 54, 60.)

After Zurich removed to this Court, I denied Plaintiff's Motion to Remand.  (Doc. Nos. 9, 16.)  At the Parties' joint request, I stayed proceedings pending the Wilson Court's resolution of a consolidated appeal (from fourteen dismissals of similar COVID-19-related coverage actions), in which the Circuit considered whether under Pennsylvania law, "the business' inability to use their

3

properties for their intended business purposes constituted 'physical loss of' property as that phrase is used in the [various insurance] policies." See Wilson, 57 F.4th at 140; (Doc. Nos. 17, 18.) Predicting how the Pennsylvania Supreme Court would rule, the Circuit held that it did not. Wilson, 57 F.4th at 140.

Lifting the stay, I granted the Parties' joint request to allow Urban Outfitters to amend its Complaint—presumably with Wilson in mind. (Doc. Nos. 21, 22.) The Company chose not to amend.

Zurich now urges that Wilson bars the coverage Urban Outfitters seeks. (Doc. No. 25.) Urban Outfitters counters, *inter alia*, that Wilson is factually distinguishable, and, in the alternative, asks me to stay this matter pending the Pennsylvania Supreme Court's resolution of the coverage questions addressed in Wilson. (Doc. Nos. 28, 29.)

The matter is fully briefed. (See Doc. Nos. 25, 28, 29, 30.)

## II. LEGAL STANDARDS

### A. Motion to Dismiss

I must conduct a two-part analysis. Fowler v. PMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009); Fed. R. Civ. P. 12(b)(6). First, I must accept the plaintiff's factual allegations, and disregard legal conclusions or mere recitations of elements. Fowler, 578 F.3d at 210. I then determine whether the facts alleged make out a "plausible" claim for relief. Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that [the defendant] has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Accordingly, the defendant must show that the plaintiff has failed to allege facts sufficiently detailed to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

4

In addition to the Complaint itself, I may consider documents attached to it, matters of public record, and any other undisputedly authentic documents without converting a dismissal motion into one for summary judgment. Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1197 (3d Cir. 1993).

**B. Policy Interpretation**

In construing an insurance policy, I must "ascertain the intent of the parties as manifested by the language of the written instrument," reviewing the policy in its entirety and in accordance with the plain and ordinary meaning of its terms. Am. Auto. Ins. Co. v. Murray, 658 F.3d 311, 320 (3d Cir. 2011) (quotation marks omitted) (applying Pennsylvania law); Riccio v. Am. Republic Ins. Co., 705 A.2d 422, 427 (Pa. 1997). Where the policy language is clear and unambiguous, I apply its terms as written. 401 Fourth Street v. Inv'rs Ins. Group, 879 A.2d 166, 171 (Pa. 2005).

Ambiguous provisions—those "reasonably susceptible of different constructions"— must be construed in favor of the insured and against the insurer. Hutchison v. Sunbeam Coal Corp., 513 Pa. 192, 519 A.2d 385, 390 (1986); see Med. Protective Co. v. Watkins, 198 F.3d 100, 104 (3d Cir. 1999) (applying Pennsylvania law). I may not "rewrite the terms of a policy or give them a construction in conflict with the accepted and plain meaning of the language of the policy," or "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc., 858 F. 2d 128, 131 (3d Cir. 1981); Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999). Rather, I "interpret the policy so as to avoid ambiguities and give effect to all of its provisions." Am. Auto. Ins. Co. Auto., 658 F.3d at 321.

Finally, in interpreting the Zurich Policy, I will bear in mind that it is a contract between

two large, sophisticated corporations that should be held to the agreement they made. See National Educ. Fin. Servs., Inc. v. U.S. Bank, Nat. Ass'n, Civ. No. 12–6651, 2013 WL 6228979, at * 7 (E.D. Pa. Dec. 2, 2013) ("As is logical, courts have noted that concerns with unequal bargaining power in a transaction . . . are not present in transactions between two sophisticated business entities."); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 620 (3d Cir. 1995) ("If the parties to the contract were sophisticated business entities engaging in an arms-length transaction, ordinary contract principles would govern their relationship.").

### III. DISCUSSION

Under Pennsylvania law, "an insured bears the initial burden to make a *prima facie* showing that its claim falls within the policy's grant of coverage." State Farm Fire & Cas. Co. v. Est. of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). If the insurer then denies coverage, it must show that an exclusion applies. Id.

Urban Outfitters had initially sought coverage under various "Special Coverages" provisions (*i.e.*, the Civil Authority, Ingress/Egress, and Tenants Prohibited Access provisions). It has failed, however, to respond to Zurich's contention that these provisions are inapplicable because the insured was never denied access to its properties. (See Doc. No. 25-1 at 13-15; see Doc. No. 28 at 11-16.) The Company has thus abandoned its coverage claims under those provisions. Levy-Tatum v. Navient Sols., Inc., 183 F. Supp. 3d 701, 712 (E.D. Pa. 2016) (dismissing claims the plaintiff failed to defend in opposing the defendant's motion to dismiss).

In seeking coverage under the Policy's Time Element provisions (all requiring "direct physical loss or damage" to property), the Company alleges that it lost the use of its 200 stores, and urges that the virus's lingering presence in the air and adhesion to surfaces physically damaged those stores, rendering them uninhabitable. (See, e.g., Compl. ¶¶ 27, 31, 32.) The Wilson Court

rejected these same arguments, interpreting identical policy language.

### A. Wilson

In their consolidated Third Circuit appeals, numerous insureds—food service, medical, health and wellness, art, music, and legal businesses—sought to recover losses caused by the pandemic and resulting government closure orders. They proceeded under their policies' business income and extra expense provisions, all of which allowed coverage only for "direct physical loss or damage to" the insured properties. Wilson, 57 F. 4th at 138. The Circuit denied the request of several insureds to stay proceedings and certify to the Pennsylvania Supreme Court questions related to the meaning of "direct physical loss or damage." See Wilson v. USI Ins. Serv. LLC, 2023 WL 120876 (3d Cir. Jan. 5, 2023).

The Circuit first ruled that "loss of use caused by government edict and untethered to the physical condition of the premises is not a physical loss or damage to the properties" within the meaning of the subject policies. Wilson, 57 F.4th at 143. Rather, the Court determined that under Pennsylvania law, "physical damage to property" denotes "a distinct, demonstrable, and physical alteration of its structure," and that "physical loss of property" denotes "a failure to maintain tangible possession of the structure." Id. at 142. It explained that "in a case where sources unnoticeable to the naked eye . . . have allegedly reduced the use of the property to a substantial degree," the insured must meet "a higher threshold," and show "that the functionalities of their properties were nearly eliminated or destroyed, that the structures were made useless or uninhabitable, or that there was an imminent risk of either of those things happening." Id. (extending Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226 (3d Cir. 2022)).

Seeking to meet this heightened standard, several plaintiffs urged that:

> [T]he actual or suspected presence of the coronavirus on their premises rendered the properties unsafe and uninhabitable, comparing the coronavirus to contamination by noxious substances, such as ammonia or gasoline, which courts have determined to be covered under commercial insurance policies.

Id. at 145. The Court rejected this contention:

> [H]ere, no business alleged that the coronavirus was present in its property in such a form or quantity as to make the property dangerous and uninhabitable. Even at its peak, buildings in which the coronavirus inevitably amassed—such as hospitals and grocery stores – remained open and inhabitable. Indeed, as [certain] businesses acknowledge, whether the coronavirus was present in their properties would have made no difference: the closure orders applied to nonessential business across the board, regardless of the presence of the virus on the businesses' properties.

Id. at 145-46. In thus holding that the insureds had failed to demonstrate their entitlement to coverage, the Third Circuit joined "every other Court of Appeals and all but one state supreme court to have considered t[he] issue." Id. at 143 n.6 (listing decisions).

The Wilson Court declined to address the subject policies' virus or ordinance and law exclusions. Id. at 148.

### B. The Zurich Policy Does Not Provide Coverage

Because Urban Outfitters—like the insureds in Wilson—seeks to recover losses resulting from both the physical presence of COVID-19 in its properties and government closure orders, Zurich argues that Wilson compels dismissal. (See, e.g., Compl. ¶¶ 27, 31, 32; Doc. No. 28 at 8.) The Company disagrees.

First, Urban Outfitters contends that its burden to show coverage entitlement is "relatively light" because its Zurich Policy is "all risk." (Doc. No. 28 at 15-16.) "Under [all-risk] policies, the insurer agrees to pay for all fortuitous losses that are not excluded under the contract," and the insured need not explain the precise cause of loss. Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 234 (3d Cir. 2022); see also In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 77–78 (2d Cir. 1996) ("In order to recover under an all risk policy, the burden of

8

proof is on the insured to prove a fortuitous loss of the covered property. The insured, however, need not prove the cause of the loss.").

Yet, the insured must still meet its "burden to establish that [its] structures were, in fact, physically damaged in order to trigger coverage." Port Authority of N.Y. & N.J., 311 F.3d at 232, 235 (considering all-risk policy). Moreover, as Wilson made clear, where an insured's claim is based on harm caused by sources invisible to the naked eye, the insured must meet a *higher* threshold to demonstrate the existence of "direct physical loss or damage" to covered property. Id. Urban Outfitter's casual reliance on its "relatively light" burden to prove the *cause* of loss is thus beside the point: the Company must still prove that it sustained physical loss or damage.

The Company offers a Pennsylvania Superior Court holding that "at a minimum, [it is] reasonable to find that [the insured's] loss of the use of his [business] due to COVID-19 and the governmental orders equated to a direct physical loss of his property." Ungurean v. CAN, 286 A.3d 353, 356 (Pa. Super. Ct. 2022); (see Doc. No. 28 at 17-18.)

When the Pennsylvania Supreme Court has yet to address a question of Pennsylvania law, I would ordinarily defer to Superior Court decisions in which the question is addressed. Holmes v. Kimco Realty Corp., 598 F. 3d 115, 118 (3d Cir. 2020). Because, however, the Third Circuit has already addressed the coverage question presented here—anticipating how the state Supreme Court will rule—Wilson necessarily controls here. See Largoza v. General Elec. Co., 538 F. Supp. 1164, 1166 (E.D. Pa. 1982) ("First and foremost, it is axiomatic that this court is bound by a decision of the Third Circuit predicting Pennsylvania law unless the state supreme court issues a contrary decision.").

In any event, apposite Superior Court decisions are contradictory. The Wilson Court "carefully reviewed the reasoning" not only of Ungarean v. CNA, but of MacMiles, LLC v. Erie

9

Ins. Exch., 286 A.3d 331 (Pa. Super. Ct. Nov. 30, 2022)—a Superior Court decision issued by the same panel on the same day it issued Ungarean. Wilson, 57 F.4th at 144 n.7. In MacMiles, the panel found no coverage (under a policy requiring "direct physical loss or damage") for the loss of use of a commercial property ostensibly rendered uninhabitable by the presence of COVID-19. A.3d at 339 (Pa. Super. Ct. 2022). The Third Circuit deemed these contradictory rulings "a less useful measure in determining how the Supreme Court of Pennsylvania would decide the issues," and so predicted that the state's highest court would hold that the subject policies unambiguously precluded coverage. Wilson, 57 F.4th at 144-45 n.7. I am obligated to follow Wilson.

Finally, Urban Outfitters urges that its own action involves "hundreds of closures of insured locations"—each location varying in "the number of persons infected with COVID-19, the degree of community spread, and the dictates of the government orders"—unlike that of Wilson's lead plaintiff, who had sought coverage for losses related to the closure of a single law office. (Doc. No. 28 at 16.)  The Company ignores, however, that Wilson comprised *fourteen* consolidated appeals by multiple policyholders across different industries and locations, thus presenting a similarly wide array of circumstances. The Third Circuit nonetheless disposed of the cases together because each involved: (1) policy language requiring the insured to show "direct physical loss or damage" to property; and (2) allegations that the COVID-19 pandemic and resulting government closure orders—which were "untethered to the physical condition of the premises"—caused the losses and expenses. Wilson, 57 F.4th at 141-47. The Company's instant claims turn on the same policy language and circumstances, which, under Wilson, preclude coverage as a matter of law. Cf. Goodman Management LLC v. Zurich Am. Ins. Co., 2023 WL 2351696, at *2 (E.D. Pa. 2023) (dismissing similar complaint pursuant to Wilson); Fegley Management & Energy, LLC v. Cincinnati Ins. Co., 2023 WL 2364726 (E.D. Pa. Mar. 1, 2023)

10

(rejecting argument that insured's claim differs from that raised in Wilson because insured alleged the physical presence of COVID-19 on covered properties).

In sum, Urban Outfitters has failed demonstrate its entitlement to coverage.

Because Wilson resolves the instant dispute, I will deny the Company's alternative request that I stay proceedings pending the Pennsylvania Supreme Court's resolution of Ungarean and Macmiles. (Doc. No. 28 at 22-23); see Fegley, 2023 WL 2364726 (denying identical request to stay proceedings and "agree[ing] with the conclusion reached by the Third Circuit on this question"); Abington Kids Creative Learning Center, Inc. v. Utica Nat. Ins. Group, 2023 WL 2539659, *3 (M.D. Pa. Mar. 16, 2023) (holding that "a stay is not warranted, given that there is now binding precedent in [the Third] circuit that facilitates the resolution of the issues before the Court").

### C. The Policy's Contamination Exclusion Bars Plaintiff's Claim.

In the alternative, I conclude that the Company's coverage claim—predicated on virus-caused expenses and losses—is barred by the Policy provision that excludes from coverage "Contamination and any cost due to Contamination, including the inability to use or occupy the property or any cost of making property safe or suitable for use or occupancy." (Policy § 3.03.01.03.) The Policy defines "Contamination" as "any condition of property due to the actual presence of any . . . *virus*, disease causing or illness causing agent." (Id. § 7.11 (emphasis added).)

Urging the Contamination Exclusion's inapplicability, Urban Outfitters notes that: (1) the exclusion bars only *costs*—not the *losses* it seeks; and (2) the Policy's "Louisiana Amendatory Endorsement"—which removes "virus" from the definition of "Contamination"—applies to risks outside Louisiana (and thus to its own claim). I disagree.

First, the provision explicitly excludes "Contamination *and* any cost due to

11

Contamination."  Indeed, "[c]ontamination" is itself an independent basis for exclusion.  It also excludes "any cost due to Contamination."  The Company's suggestion that the provision excludes *only* costs impermissibly contradicts the provision's literal terms.  See AECOM v. Zurich Am. Ins. Co., No. 22-55092, 2023 WL 1281675, at *2 (9th Cir. Jan. 31, 2023) ("The exclusion applies both to 'Contamination'—meaning the underlying condition of the property due to the presence of virus—and to 'any cost due to Contamination.'"); Detroit Entertainment, LLC v. Am. Guarantee and Liability Ins. Co., 2023 WL 2392031, at *12 (E.D. Mich., Mar. 7, 2023) ("The use of the word 'and' signifies the intent to *add* coverage for 'any cost due to Contamination,' not *limit* or exclude coverage for other losses caused by Contamination.") (emphasis in original).

Further, the "Louisiana Amendatory Endorsement"—one of thirty-one state-specific endorsements in the Policy—applies only to risks arising in Louisiana and has no bearing on the Company's claim.  Urban Outfitters nonetheless notes that although the Louisiana Endorsement begins, "**THIS ENDORSEMENT CHANGES THE POLICY**," other state endorsements expressly limit their application to risks in a single state.  For example, the "Connecticut Amendatory Endorsement" begins, "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT**."  (Doc. No. 28 at 19.)  Urban Outfitters thus argues that only an endorsement similarly limiting its application to risks in one state may be so interpreted.  In the Company's view, the Louisiana Endorsement (and other similarly worded endorsements) must be interpreted to apply to risks arising in *every* state.  (Id.)  Seeking to annul the endorsement's explicit reference to Louisiana in its title, Urban Outfitters notes a separate Policy section providing that titles "shall not in any way affect the provisions to which they relate." (Id. at 19-20 (citing Policy § 6.21).)

The Louisiana Endorsement and the 28 others that also begin "**THIS ENDORSEMENT**

12

**CHANGES THE POLICY**" cannot reasonably be interpreted to apply to *every* state because several of the endorsements make additional, inconsistent amendments to the subject Policy. (Compare, e.g., Policy, Amendatory Endorsement – Louisiana ¶ 8 (requiring legal action in suits against the Company *within 24 hours* after the date of direct physical loss or damage to property), with id., Amendatory Endorsement – Illinois ¶ 2 (requiring legal action in suits against the Company *within twelve months* after the date of direct physical loss or damage to property)).  The only way to harmonize these provisions is to read each state-specific endorsement as applying to risks arising in that state.  See AECOM, 2023 WL 1281675, at *2; see also Clarke v. MMG Ins. Co., 100 A.3d 271, 276 (Pa. Super. Ct. 2014) ("Indeed, if the court is "forced to choose between two competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the interpretation which allows us to give effect to all of the policy's language.") (quotations and citations omitted).

In sum, the Contamination exclusion bars coverage for the Company's claims.

**IV.   CONCLUSION**

For the foregoing reasons, I will grant Zurich's Motion to Dismiss (Doc. No. 25) and dismiss Urban Outfitters's Complaint with prejudice because amendment would be futile. Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983).

I will deny the Company's stay request.

I will not address whether the Policy's Law and Ordinance Exclusion also precludes coverage.

An appropriate Order follows.

June 28, 2023                                                              */s/ Paul S. Diamond*
                                                                           _____
                                                                           Paul S. Diamond, J.